# EXHIBIT A



# Notice of Service of Process

**null / ALL**
**Transmittal Number: 31725685**
**Date Processed: 06/27/2025**

| | |
|---|---|
| **Primary Contact:** | James M Sack Esq.<br>The Sack Law Firm P.C.<br>8270 Greensboro Dr<br>Ste 950<br>Mc Lean, VA 22102-4909 |
| **Electronic copy provided to:** | Karen Fettig<br>Nancy Ryan<br>Suzanne Lemley<br>Grant Willis<br>Valerie Patin |

| | |
|---|---|
| **Entity:** | NVR, Inc.<br>Entity ID Number  0451094 |
| **Entity Served:** | Nvr , Inc. |
| **Title of Action:** | William Lawrence vs. Nvr, Inc. |
| **Matter Name/ID:** | William Lawrence vs. Nvr, Inc. (17530944) |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Contract |
| **Court/Agency:** | Lorain County Court of Common Pleas, OH |
| **Case/Reference No:** | 25CV216959 |
| **Jurisdiction Served:** | Ohio |
| **Date Served on CSC:** | 06/27/2025 |
| **Answer or Appearance Due:** | 28 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Certified Mail |
| Sender Information: | Fortney Law, LLC<br>330-619-8502 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

251 Little Falls Drive, Wilmington, Delaware 19808-1674   (888) 690-2882   |   sop@cscglobal.com

# LORAIN COUNTY COURT OF COMMON PLEAS
## LORAIN COUNTY JUSTICE CENTER
## 225 COURT STREET
## ELYRIA, OHIO 44035

WILLIAM LAWRENCE
9072 NASH LANE
NORTH RIDGEVILLE, OH 44039

CASE NO. 25CV216959

VS.

TO: NVR, INC. C/O CORPORATION SERVICE
COMPANY
1160 DUBLIN ROAD
SUITE 400
COLUMBUS, OH 43215

# S U M M O N S   O N   C O M P L A I N T

You have been named defendant in a complaint filed in Lorain County Court of Common Pleas by plaintiff(s):

WILLIAM LAWRENCE
9072 NASH LANE
NORTH RIDGEVILLE, OH 44039

A copy of the complaint is attached hereto. The name and address of the plaintiff's attorney is:

MICHAEL R FORTNEY
300 WEATHERSTONE DR
#303
WADSWORTH, OH 44281

You are hereby summoned and required to serve a copy of your answer to the complaint upon the plaintiff's attorney, or upon the plaintiff, if he has no attorney of record, within **TWENTY-EIGHT (28) DAYS** after service of this summons on you, exclusive of the day you receive it. Your answer must **ALSO** be filed with this Court within three (3) days after you serve, (delivered or by mail), a copy of your answer on the plaintiff's attorney.

If you fail to appear and defend, judgment by default will be rendered against you for the relief demanded in the complaint.

*TOM ORLANDO*
**CLERK OF COURTS OF COMMON PLEAS**
**LORAIN COUNTY, OHIO**

**6/25/2025**

BY: _____
**Deputy Clerk**



FILED
LORAIN COUNTY

2025 JUN 23 ℗ 2: 53

COURT OF COMMON PLEAS
TOM ORLANDO

**IN THE COURT OF COMMON PLEAS**
**LORAIN COUNTY, OHIO**

**25CV216959**

WILLIAM LAWRENCE
9072 Nash Lane
North Ridgeville, OH 44039

and

VICTORIA LAWRENCE
9072 Nash Lane
North Ridgeville, OH 44039

Plaintiffs,

vs.

NVR, INC.
c/o Corporation Service Company
1160 Dublin Road, Suite 400
Columbus, OH 43215

Defendant.

CASE NO.

JUDGE

**JUDGE D. CHRIS COOK**

**COMPLAINT**

Plaintiffs William and Victoria Lawrence, through counsel, for their Complaint against

Defendant NVR, Inc., allege the following:

### INTRODUCTORY STATEMENT

1.      Plaintiff William Lawrence is an individual and a resident of the State of Ohio,

presently residing at 9072 Nash Lane, North Ridgeville, Ohio, 44039.

2.      Plaintiff Victoria Lawrence is an individual and a resident of the State of Ohio,

presently residing at 9072 Nash Lane, North Ridgeville, Ohio, 44039.

3. Defendant NVR, Inc. is a corporation, organized and operating under the laws of the State of Virginia.

4. This Court has jurisdiction over this case pursuant to R.C. § 2305.01 because the amount at issue exceeds $15,000.

5. Venue is proper in this Court pursuant to Civ.R. 3(C) because the activities conducted by Defendant took place in North Ridgeville, Ohio in Lorain County.

## FACTS

6. Plaintiffs William and Victoria Lawrence (together "Plaintiffs") entered into a contract with Defendant NVR, Inc. (NVR) on June 2, 2021 (the "Contract").

7. A true copy of the Contract is attached to this Complaint as Exhibit 1.

8. The Contract called for Plaintiffs to purchase a lot and for NVR to build a home on the lot at 9072 Nash Lane (the "Project").

9. The Contract is a "home construction service contract" as that term is used in R.C. § 4722.01(C).

### The Water Issues

10. The Project was completed in or around November of 2021, and Plaintiffs moved into their new home shortly afterward.

11. Beginning in 2022, after the weather warmed up, Plaintiffs began to notice water related issues with their home.

12. Specifically, Plaintiffs noticed that an abnormal amount of water seemed to be entering the home and causing the sump pump to work at an excessive rate.

13. Plaintiffs also began noticing smells that seemed to appear any time it rained in the vicinity of their home.

2

14.     Plaintiffs began informing NVR of the issues in the three preceding paragraphs in the spring and summer months of 2022.

15.     NVR did not inspect the Project in any reasonable manner in 2022 after being informed of the potential water issues with the Project.

16.     Instead, NVR informed the developer of the Project.

17.     The developer took action and determined that a source for the excessive water could be a storm sewer lateral near the front yard of the Project.

18.     The developer made that repair in 2023.

19.     The repair made to the storm lateral did not solve the problems with water related to the Project.

20.     After the storm lateral repair was completed, the smells after rain continued, and the Project continued to suffer from excessive water that caused Plaintiffs' sump pump to remove water at a high rate.

21.     Once again, Plaintiffs continued to notify NVR of the ongoing problems related to the Project.

**The Basement Flooding**

22.     Finally, in December of 2024, approximately three years after the Project was completed, Plaintiffs' basement flooded.

23.     Plaintiffs immediately informed NVR.

24.     NVR informed the City of North Ridgeville, and the City came to check the Project in order to determine whether they could be at fault.

25.     First, the City checked the storm lateral, which was fine.

3

26. Then the City checked to see if the water inside Plaintiffs' home was chlorinated, which would indicate that it was City water entering the Project, but the water was not chlorinated.

27. The lack of chlorination meant that the water was storm water of some sort.

28. NVR was made aware that storm water flooded the Project.

29. Again, NVR did nothing to fix the flooding or water intrusion problems with the Project.

30. NVR also did nothing to inspect the Project or determine a source of the flooding.

**The Pond Drain**

31. On or around January 3, 2025, less than a week after Plaintiffs' basement flooded, Plaintiffs informed NVR that they believed the retention ponds at the rear of the Project were causing the flooding.

32. Again, NVR did not do any of its own investigation.

33. Instead, NVR once again punted investigation responsibilities to another, this time Paul Haney, from the management company for Plaintiffs' HOA.

34. Mr. Haney told NVR and the City that he inspected the pond and found no issues.

35. Plaintiffs were not satisfied with this response and sought additional opinions.

36. Plaintiffs reviewed their own pictures from construction and noticed an image showing an underground drain that was cut through and damaged by NVR (or its subcontractor) during the excavation for the Project.

37. Plaintiffs informed NVR of this situation on February 20, 2025, so that NVR could inspect the issue.

38. NVR never responded to that email, and NVR never sent anyone out to investigate the issue.

4

39.     Instead, Plaintiffs had to hire American Earth Companies (American Earth) to fully determine the cause of the excess water entering Plaintiffs' home.

40.     American Earth performed an inspection of the Project on March 28, 2025.

41.     The inspection was performed at the direction of Tyker Hrusch, a civil engineer.

42.     American Earth found the drain in question that was cut by NVR during construction, and American Earth determined that this drain came from the pond, the drain was wet (meaning it was active), and the drain was the source of the additional water entering Plaintiffs' home.

43.     American Earth also found that NVR (or its subcontractor) was aware of the damaged drain because they attempted to cover the broken drain with stone, but they did not properly seal the drain.

44.     After excavating and determining the issue, American Earth capped the drain at issue, and American Earth also attempted to close the drain at its source.

45.     Both of the fixes mentioned in the preceding paragraph appear to have worked, because Plaintiffs have not suffered any additional water intrusion issues since American Earth performed the fix.

**Plaintiffs' Damages**

46.     In addition to the failures of NVR related to the cut drain and the water intrusion to Plaintiffs' property, Plaintiffs' physical property was damaged and Plaintiffs were forced to pay additional sums to plumbers and other contractors in an effort to fix and mitigate damages associated with the water intrusion.

47.     Plaintiffs had to pay for multiple visits from plumbers before determining the drain issue, as well as costs for additional sump pumps.

5

48.     Plaintiffs had to pay for mitigation associated with the flood.

49.     Plaintiffs lost over $25,000 in physical property that was damaged by the flooding of the interior of their home.

50.     Additionally, the basement of Plaintiffs' home was finished, and it will need to be entirely redone.

51.     Plaintiffs' patio has also been damaged by the excessive water and has sunk to a point where it needs to be replaced.

52.     Plaintiffs also had to pay American Earth for the exploratory digging to determine the problem, as well as the fix for the problem.

53.     Plaintiffs also had to pay a landscaper to repair the damage to the yard caused by the exploratory digging performed by American Earth.

54.     Plaintiffs may suffer damages in addition to the damages described in this Complaint, each of which stems from NVR's breaches of the Contract, namely the failure to build the home in a workmanlike manner.

## FIRST CLAIM: BREACH OF CONTRACT

55.     Plaintiffs restate and reallege each of the preceding paragraphs as if fully restated herein.

56.     Plaintiffs fully performed their obligations under the Contract.

57.     NVR breached the Contract by failing to complete the Project in a workmanlike manner, failing to properly cap and seal the drain exposed during construction, and causing other damages related to their breaches of the Contract.

58.     Plaintiffs have been damaged by NVR's failures to perform the Project in an amount to be proven at trial, but believed to exceed $25,000.

6

## SECOND CLAIM: R.C. § 4722 (HOME CONSTRUCTION SERVICE SUPPLIERS ACT)

59. Plaintiffs restate and reallege each of the preceding paragraphs as if fully restated herein.

60. Plaintiffs are each an "owner" as defined by R.C. § 4722.01(E).

61. NVR is a "supplier" as defined by R.C. § 4722.01(D).

62. The Contract is a "home construction service contract" as defined by R.C. § 4722.01(C).

63. NVR committed multiple violations of R.C. 4722.03.

64. NVR failed to perform the home construction service in a workmanlike manner, by cutting the drain and then failing to adequately seal the drain to prevent excess water from entering Plaintiffs' home.

65. The allegation contained in the preceding paragraph is a violation of R.C. 4722.03(A)(1)(d).

66. Section 6 of the Contract also contains a waiver of the implied warranties of workmanship and building in a workmanlike manner, meaning NVR made the performance of the home construction service contingent upon Plaintiffs waiving rights provided by R.C. 4722.

67. The allegation contained in the preceding paragraph is a violation of R.C. 4722.03(A)(4).

68. Pursuant to R.C. 4722.08(A), Plaintiffs are entitled to recover their actual economic damages, plus $5,000 in noneconomic damages for each violation of R.C. 4722.

69. Further, pursuant to R.C. 4722.08(D)(2), since NVR committed the acts knowingly, Plaintiffs are entitled to an award of attorney fees.

7

70.     Plaintiffs have been damaged by Defendants and are entitled to recovery of their actual economic damages to be determined at trial, plus an award of at least $10,000 in non-economic damages, plus attorney's fees under the Home Construction Service Suppliers Act, R.C. § 4722.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs William and Victoria Lawrence pray for the following relief:

(1)     As to the First Claim, a judgment declaring that Defendant NVR, Inc. breached the Contract, and finding Plaintiffs have been damaged by said breach in an amount to be proven at trial.

(2)     As to the Second Claim, a judgment declaring that Defendant NVR, Inc. violated Ohio's Home Construction Service Suppliers Act and, pursuant to R.C. § 4722.01, et seq., awarding Plaintiffs their actual economic damages to be proven at trial, plus at least $10,000 in noneconomic damages, plus the attorney's fees and costs incurred by Plaintiffs in prosecuting this action, to be decided at a subsequent hearing.

(3)     Pre- and post-judgment interest at the statutory rate.

(4)     Such other relief as the Court deems just and proper under the circumstances.

Respectfully submitted,

Michael R. Fortney (#0092325)
FORTNEY LAW, LLC
300 Weatherstone Dr. #303
Wadsworth, OH 44281
(330) 619-8502
mike@ohiolienlawyer.com

Attorney for Plaintiffs

8

**EXHIBIT 1**

Lot __M150__  Block _____
Date of Purchase Agreement __06/02/21__
RIDGEVILLE,OH 44039

Property  Address  Community __Winfield Farm__
9072  NASH  LANE  NORTH

# OHIO PURCHASE AGREEMENT

THIS PURCHASE AGREEMENT (the "Agreement") is made as of the __2__ day of _____June_____, 20 __21__, by and between NVR, INC. t/a __Ryan Homes__, a Virginia corporation ("Seller", "Us", "Our" or "We") and _____Victoria Lawrence_____ (purchaser) and _____ (co-purchaser), presently residing at __9292 Victoria Lane  North Ridgeville,OH 44039__ (telephone) __440-537-4786__ (individually and collectively "Purchaser", "You" or "Your"). Our address and telephone number is __6770 W Snowville Rd__
__Brecksville, OH 44141__
_____. Our tax identification number is __54-1394360__.

1.  **What You are buying.** The Property You are buying is:

Lot # ___00000150___, Section # _____, Block # _____, Subdivision __Winfield Farm__ (the "Community"). County or City of ___LORAIN___, State of Ohio (the "Lot"), together with a home to be built on the Lot by Seller according to Seller's plan known as the _____LAKELAND_____ Model, Set/Version # _____LKD00-01_____, including those options you have selected on the attached Master Selection Sheet. We will call this the "Home" and, with the Lot, the "Property" throughout this Agreement.

The Home may not be exactly like any of the model homes You may have seen. Also, the Home may be different than what You have seen in our advertisements and marketing information. The Home will be constructed as shown on the construction drawings (or blueprints), the grading plan, the record plat of subdivision, floor plans and other plans related to the construction of the Home, all of which You acknowledge that You reviewed, together with the options You selected on the Master Selection Sheet, which is incorporated into this Agreement by reference, and any Change Orders we mutually agree to during the time Change Orders are allowed to be submitted as provided in the Change Order Policy provided below. All of these together are called the "Plans and Specifications". You should also note that there are many ways to measure square footage so the final square footage of the Home may be different than that which is initially shown to You due to the method of measurement.

We offer You a wide variety of options to personalize Your Home to meet Your individual needs and requirements. Many of the components needed to construct the Home must be ordered well before construction begins and any changes after the date of this Agreement could affect the start of construction, loan approval process and closing of Your Home. In addition, many changes requested after the date of this Agreement require additional administrative, engineering, permit and loan approval actions, which may make the changes not only cost prohibitive, but can cause significant time delay.

All change requests are subject to Our approval. We are under no obligation to accept any change request beyond these change periods. We firmly adhere to this policy in order to best serve You and deliver the Home without delays.

The following is Our "Change Order Policy". Structural option change requests will be accepted within __14__ days after Your execution of this Agreement. All Change Order Addenda must be signed by You (if more than one Purchaser, all Purchasers must sign) and submitted to Your Sales Representative within this __14__ day time period or the change request will not be accepted or processed.

Non-structural option selections and/or change requests will be accepted as described below. All Change Order Addenda must be signed by the Purchaser (if more than one Purchaser, all Purchasers must sign) and submitted to Your Sales Representative within this time period or the change request will not be accepted or processed.

The final date that requests for flooring changes will be accepted is on or before: _____06/16/2021_____.
The final date that requests for wiring changes will be accepted is on or before: _____06/16/2021_____.
The final date that requests for all other non-structural changes will be accepted is on or before: _____06/16/2021_____.
☐ If the box to the left is checked, no changes will be allowed for this Property.

PURSUANT TO O.R.C. SEC. 4722.01, IF AT ANY TIME A HOME CONSTRUCTION SERVICE REQUIRES EXTRA COSTS ABOVE THE COST SPECIFIED OR ESTIMATED IN THE CONTRACT THAT WERE REASONABLY UNFORESEEN, BUT NECESSARY, AND THE TOTAL OF ALL EXTRA COSTS TO DATE EXCEEDS FIVE THOUSAND DOLLARS OVER THE COURSE OF THE ENTIRE HOME CONSTRUCTION CONTRACT, YOU HAVE A RIGHT TO AN ESTIMATE OF THOSE EXCESS COSTS BEFORE THE HOME CONSTRUCTION SERVICE SUPPLIER BEGINS WORK RELATED TO THOSE COSTS. INITIAL YOUR CHOICE OF THE TYPE OF ESTIMATE YOU REQUIRE:

_____ Written Estimate                _____ Oral Estimate

We make no representations or warranties about what other improvements may be constructed within the Community including home types, sizes, location or prices or the uses of property adjacent to the Property or to the Community. Any plans or information You may have seen for this Community are subject to change. Unless otherwise stated in an addendum to this Agreement. We have no obligation to provide You with copies of the preliminary or final site plans, the record plat, blueprints, general plan maps or other planning documents which may affect the planning and development of the surrounding area. Also, utility transformers are the sole responsibility of the utility companies and we have no authority to determine where utility transformers may be located on the Property or anywhere in the Community.

You acknowledge that the timing of construction, location, existence, size and features of tot lots, trails, community entry features and monuments, and recreational facilities within the Community (collectively the "Facilities"), if any, are subject to change. No representations as to the timing, location, size or features of such Facilities are part of this Agreement.

You are purchasing the Property as [CHECK BOX A, B, C OR D BELOW]:

☒   A.   Your principal residence and will occupy and reside in the Property.

OHMASTERSALEAGT.121720
Print Date: 6/2/2021

Page 1 of 11

☐    B.    a model home pursuant to the attached Model Home Addendum.

☐    C.    a second home.

☐    D.    an investor. The Property will <u>not</u> be Your principal residence and You will not occupy and reside in the Property. You are not acquiring the Property as a second home. If this box is checked, Paragraph 4 does not apply to You.

You hereby represent and warrant to Us the truth and accuracy of the statements made above and You understand and agree that We are relying on the truth and accuracy of these statements as a material inducement to Our entering into this Agreement with You. If Your statements made above are found to be untrue or inaccurate, or if Your status changes prior to Settlement, You will be deemed to have checked the box above that truly and accurately reflects the circumstances involving Your purchase of the Property. In such event, We may require You to increase the Deposit, at Our discretion. Under such circumstances, You would be required to pay such Deposit increase to Us within ten (10) days after Our request for such additional Deposit is made. Your failure to fund any such increase of the Deposit shall be deemed to be a material breach of the Agreement.

2. **Sales Price and Payments.** You agree to pay to Seller for the Property, including the options listed on the Master Selection Sheet, the sum of $\underline{\hspace{0.5cm}481,030.00\hspace{0.5cm}}$ (the "Purchase Price") payable as follows:

(a) Cash earnest money deposit upon Purchaser's signing of this Agreement........................... $\underline{\$5,000.00\hspace{0.5cm}}$

(b) An additional payment in cash due on or before $\underline{\hspace{0.3cm}7/2/2021\hspace{0.3cm}}$ ................................. $\underline{\$28,000.00\hspace{0.5cm}}$

(c) The balance in immediately available funds to be electronically transferred to the agent conducting the Settlement on the Actual Settlement Date hereunder................................................................................................................. $\underline{\$448,030.00\hspace{0.5cm}}$

The term "Deposit" shall mean all amounts due from Purchaser to Seller pursuant to Paragraphs 2(a) and 2(b). Any checks accepted by Seller shall be subject to collection and payment. All refunds or credits to Purchaser of the Deposit shall be without interest, except as provided in Paragraph 13(b).

3. **Payment of Closing Costs and Cash Discount.** You are responsible for payment of all "Closing Costs" unless You are otherwise eligible for the Cash Discount as defined by this Paragraph and as permitted by applicable law.

"Closing Costs" are the fees and charges charged by Your lender and third parties related to the purchase and finance of your Home. Closing Costs include all charges due to Your lender, home insurance premiums, mortgage insurance premiums, title insurance premiums, Your attorney's fees, realtor commissions (unless We have agreed to pay these for You), all recordation fees and taxes (even if typically paid by a seller or grantor), and any other fees charged for the Settlement.

A Cash Discount is a credit applied toward the payment of Closing Costs. The Cash Discount cannot exceed the amount of Closing Costs due.

**You have the right to obtain a loan from any lender You choose.**

We have an affiliation with NVR Mortgage Finance, Inc. ("NVRM"). If You obtain Your mortgage loan through NVRM, You will be entitled to a Cash Discount of $\underline{\$4,810.00\hspace{0.5cm}}$ at Settlement.

**If You select a lender other than NVRM, You are not eligible to receive the Cash Discount.**

**If You select NVRM as Your lender You are eligible for the Cash Discount.**

4. **How You intend to pay the Purchase Price.** ☐ If the box to the left is checked, You are paying the Purchase Price in cash (i.e., no mortgage loan) in which case this Paragraph does not apply to You.

If the box above is not checked, You intend to apply for a mortgage loan to pay the Purchase Price at Settlement, less any amounts (such as the Deposit) that You pre-pay. In order for us to complete Your Home by the Estimated Settlement Date (which is given in Paragraph 9(a)), You are required to apply for a mortgage loan with a lender of Your choice within seven (7) days after You sign this Agreement. You are also required to diligently work with Your lender in good faith to obtain loan approval, which we will refer to in this Agreement as the "Loan Approval". While We will assist You in working with Your chosen lender, it is Your responsibility to respond to Your lender's request for information and meet all the conditions of Your loan application and the Loan Approval and to keep us informed of the status of Your application. You authorize Us to communicate with Your chosen lender and to disclose information regarding this transaction to the lender.

If You do not have Loan Approval within forty-five (45) days after the date of this Agreement (the "Loan Approval Period"), We will have the right to cancel this Agreement. If we believe You have not used good faith efforts to obtain Loan Approval, We will have the right to keep Your Deposit. If You did not obtain Loan Approval in spite of using Your good faith efforts to do so, then we will refund Your Deposit once You sign Our Mutual Release Agreement. Alternatively, We could decide to extend the Loan Approval Period. However, if We determine that You are not using good faith efforts to obtain Loan Approval during the extended Loan Approval Period, We would have the right to terminate the Agreement and keep Your Deposit.

Once You obtain Loan Approval, it is Your responsibility to meet all of the conditions required by Your lender in order for You to complete Settlement on the Actual Settlement Date (as shown in Paragraph 9(a)). Once We issue the Settlement Notice defined in Paragraph 9(a), no changes to the Loan Approval will be allowed. If the Loan Approval is terminated by the lender due to circumstances beyond your control, and You are unable to obtain another Loan Approval prior to the Actual Settlement Date, We will terminate this Agreement and refund the Deposit to You after You sign Our Mutual Release Agreement.

Notwithstanding any other provisions of this Agreement, We may at any time prior to Settlement make a good faith determination that Your lender will not be able to timely approve and fund Your Loan or that the conditions established by Your lender are unlikely to be satisfied timely. In that event We may terminate this Agreement and refund to You Your Deposit (once you execute Our Mutual Release Agreement) and this Agreement would be without further force and effect.

We will provide a Mortgage Location survey (in compliance with the standards set forth in Ohio Administrative Code Section 4733-38, as amended) at Your expense if required by Your lender, however, such survey will not include the staking of the Lot boundaries unless otherwise provided by an addendum to this Agreement.

5. **No Contingencies.** Unless otherwise provided by addendum attached hereto, this Agreement in no way is contingent upon the sale, rental, settlement or other disposition of any other property You own.

6. **Limited Warranty.** You have received a copy of Seller's limited warranty ("Limited Warranty") prior to execution of this Agreement and you agree to accept the Limited Warranty as the sole warranty being given to You. **THE LIMITED WARRANTY IS IN LIEU OF ALL OTHER WARRANTIES, EXPRESSED OR IMPLIED, INCLUDING THE IMPLIED WARRANTIES OF FREEDOM FROM STRUCTURAL DEFECTS, WORKMANSHIP, WORKMANLIKE CONSTRUCTION, MERCHANTABILITY AND HABITABILITY, ALL OF WHICH PURCHASER HEREBY WAIVES.**

7. **Right to Cure.** OHIO LAW CONTAINS IMPORTANT REQUIREMENTS YOU MUST FOLLOW BEFORE YOU MAY FILE A LAWSUIT OR COMMENCE ARBITRATION PROCEEDINGS FOR DEFECTIVE CONSTRUCTION AGAINST THE RESIDENTIAL CONTRACTOR WHO CONSTRUCTED YOUR HOME. AT LEAST SIXTY DAYS BEFORE YOU FILE A LAWSUIT OR COMMENCE ARBITRATION PROCEEDINGS, YOU MUST PROVIDE THE CONTRACTOR WITH A WRITTEN NOTICE OF THE CONDITIONS YOU ALLEGE ARE DEFECTIVE. UNDER <u>CHAPTER 1312</u> OF THE OHIO REVISED CODE, THE CONTRACTOR HAS AN OPPORTUNITY TO OFFER TO REPAIR OR PAY FOR THE DEFECTS. YOU ARE NOT OBLIGATED TO ACCEPT ANY OFFER THE CONTRACTOR MAKES. THERE ARE STRICT DEADLINES AND PROCEDURES UNDER STATE LAW, AND FAILURE TO FOLLOW THEM MAY AFFECT YOUR ABILITY TO FILE A LAWSUIT OR COMMENCE ARBITRATION PROCEEDINGS.

8. **Preconditions to Construction.** We are not required to start construction on the Home until We receive all of the following:
   (a) All cash payments as required in Paragraph 2 above within the time provided;
   (b) A written Loan Approval as required within the time period indicated in Paragraph 4 above (unless Paragraph 4 does not apply to You in which case, Loan Approval is not a precondition to construction);
   (c) Your selection of all options; and
   (d) All necessary governmental approvals and permits.
In the event We elect to commence construction prior to the receipt of (a), (b) or (c) above, You would still be obligated to complete those items.

9. **Completion of Construction; Settlement and Delivery.**
   (a) Construction is estimated to commence on or about __08/01/2021__ and be completed on or about ___11/15/21___ at which time settlement on the Property ("Settlement") shall occur (the "Estimated Settlement Date"). However, there are many variables which must be taken in consideration when scheduling Settlement, many of which We have no control over, such as Your Loan Approval, issuance of permits and the weather. Settlement will be scheduled by Us and We will give You no less than ten (10) days written notice (the "Settlement Notice") of the actual date of Settlement. We will call this the "Actual Settlement Date". At the time of Settlement, You will receive the keys You will be able to move into Your new Home. If there is a need to reschedule Settlement after issuance of the Settlement Notice, then any notice as to the rescheduled date and time will be provided to You no later than two (2) days prior to the Actual Settlement Date. If You do not complete Settlement on the Actual Settlement Date, then You will be in default of this Agreement and We would have the rights and remedies outlined in Paragraph 13(a) against You.
   We are required to complete Settlement on Your Home within two (2) years after the date of this Agreement. If we do not complete Settlement within two (2) years, then you have the rights and remedies against us outlined in Paragraph 13(b). However, if Settlement is not completed by that deadline due to Your breach or default under this Agreement, or some other reason not of Our control (see Paragraph 9(b) for a list of such reasons), then Settlement could be extended beyond the two years and We would not be in default.
   If, prior to Settlement, We believe that You are no longer willing to complete Settlement, We may ask You to provide a written statement saying that You will complete Settlement. If You do not provide such a statement, or if You otherwise give Us notice that you do not intend to complete Settlement, then You would be in default of this Agreement and We would have certain rights and remedies against You as outlined in Paragraph 13(a).
   (b) There may be delays in construction or Settlement from causes beyond Our control, including, without limitation, acts or defaults by You; labor disputes of any kind; inability to procure materials or unusual delay in deliveries; delays or actions caused by government authority; government refusal to issue any necessary permits; delays caused by utility service providers; war, acts of terrorism, civil commotion or other casualty; damage caused by fire, earthquake, flood, hurricane or severe weather; disruptions resulting from a health crisis, such as an epidemic or pandemic; or any form of act of God. If We are delayed, hindered or adversely affected by any of the foregoing events or any other events of a similar nature, whether or not the underlying event is foreseeable at the time of execution of this Agreement, the time for complete performance of this Agreement by Us (to satisfy the Interstate Land Sales Full Disclosure Act ("ILSA")) and for Settlement shall be extended for a period of time equal to the length of the delay attributable to such cause, and We would not be liable for damages for any such delay or failure to perform.
   (c) You agree to complete Settlement when the Property is Substantially Complete. Substantially Complete shall be defined as the issuance by the local jurisdiction of a temporary or conditional certificate of occupancy or other document permitting residential use (the "Residential Use Permit") even if some items such as landscaping, driveways, final grading, exterior painting, and other minor punch-list items may not be completed. We will complete any such uncompleted items as soon as practicable, weather conditions permitting. In order to do so, We reserve the right to enter onto the Property after Settlement to complete such exterior items without Your prior approval.
   (d) You have the right to schedule a private home inspection ("Inspection") of the Property by an independent home inspector at Your expense. However, the results of the Inspection must be received by Us no later than three (3) business days prior to the scheduled Settlement date. The Inspection must be performed by a full member in good standing of a national home inspection association in accordance with the ethical standards and code of conduct or practice of that association. Any home inspector must have insurance coverage acceptable to Us prior to entering the Property. You unconditionally indemnify and hold Us harmless from any injury to person or property occurring as a result of the Inspection. If You elect to hire an independent private home inspector, We

will reasonably cooperate in scheduling an Inspection; however, the Inspection must be scheduled with no less than 48 hours advance notice to Us and the Inspection must take place during normal construction working hours. The Inspection must be coordinated with Us and may not interfere with construction or delay the construction schedule. Any deficiencies identified by the Inspection shall be promptly submitted to Us in writing along with a certified report of the home inspector. In the event any deficiency identified by the Inspection is considered by Us to be a violation of any local codes or acceptable construction practices as defined in the Limited Warranty, We will correct such deficiency in a timely manner and the correction of any such deficiency shall not delay Settlement unless the deficiency is of such a nature as to make the Property uninhabitable.

(e) We will have the right to enter upon the Property at any time after Settlement for the purpose of making exterior changes to the Property, including but not limited to grading and drainage system changes and the removal or planting of trees.

(f) If We encounter any unusual or difficult ground conditions on the Lot, We may offer You one or more or the following options: (i) choosing an alternative lot from among those We are offering in the Community, if one is available or (ii) signing a Mutual Release Agreement and receiving a refund of the Deposit You have previously paid, thereby terminating this Agreement.

(g) Except as set forth in subsection (d) of this Paragraph 9, You may not have access or entry to the Property or the construction site during construction, nor may You store any possessions on the Property or the construction site prior to Settlement. Any violation of this provision may, at Our election, be considered a default of this Agreement and, in addition to any other remedies available to Us. We may terminate this Agreement and keep Your Deposit as fixed and liquidated damages. If You violate this provision, You will be deemed to be trespassing and We assume no liability or responsibility for any injuries suffered by You while on the Property or construction site, and You indemnify Us from any and all injury, cost, loss or damage arising from Your actions.

### 10. Our Changes.

(a) We have the right to substitute similar materials of substantially equivalent quality.

(b) We reserve the right to make changes in the Plans and Specifications for purposes of mechanical installations, building code and site requirements, and reasonable architectural design improvements subsequent to the date of this Agreement.

(c) We will determine, at Our discretion, the location and ground elevation of the Home and the necessity, if any, to reverse the plan of the Home to conform to the existing contours of the land.

### 11. Payment of Taxes and Utility Charges.
All taxes and utility charges, including, without limitation, sewer and water benefit charges and other public dues, taxes and charges will be adjusted to the Actual Settlement Date based upon the most recent tax bill and You will thereafter assume responsibility for such charges. If no split figures are available, no proration shall be made. You will assume and be solely responsible for payment of all taxes and assessments that are not yet due and payable as of the Actual Settlement Date and We will not provide any reimbursement or credit for any such taxes or assessments. It is also Your responsibility to have all utility services to the Property transferred into Your name effective no later than the Actual Settlement Date. No funds shall be escrowed at Settlement for utility charges.

Local jurisdictions typically assess residential property owners for the cost of public improvements such as roads, water and sewer. Many times, the information regarding the assessments is not known until after the improvements are constructed and the local jurisdiction has a certification from the engineer and contractors of the total costs expended on the improvements. This amount is then assessed against all of the homeowners who benefit from the improvements. These assessments are typically included as part of the property tax bill. Since these improvements, from planning through to completion, typically take years, additional houses which benefit from the improvements may be approved and/or built, or, alternatively, some planned projects may never come to fruition. This would affect the amount of the assessment since it is based upon the number of properties benefiting from the improvements. We make no representations or warranties regarding any assessments which may affect the Property, either now or in the future.

### 12. Title.

(a) At Settlement, title to the Property shall be conveyed by Limited Warranty Deed and shall be good and marketable, fully insurable by a reputable American Land Title Association (ALTA) title insurance company subject, however, to (i) easements, covenants, conditions and restrictions of record, (ii) any statutory lien for ad valorem taxes which are not yet levied, published, due or payable, (iii) any homeowner's association documents restricting the use and enjoyment of the Property, (iv) zoning and other applicable laws and regulations, and (v) such facts as an accurate survey and personal inspection of the Property would reflect, provided same do not render title uninsurable or unmarketable. The Property is not subject to any ground rent. If title cannot be delivered at Settlement in compliance with this Paragraph, We may determine that we will remedy such title defects prior to Settlement at Our sole expense, in which case the time herein specified for Settlement will be extended for the period of time necessary for such action. However, if We cannot perfect title or are unable to perfect title after taking reasonable legal actions, We will promptly notify You in writing and You will have the right, at Your option, to either (i) terminate this Agreement by sending Us written notice of Your decision within ten (10) days after Your receipt of Our notice, or (ii) You can waive any title defects and proceed to Settlement. At the time Settlement occurs, You will be deemed to have accepted title and We will be expressly released from all liability or damages by reason of any defect in or failure of title. If You terminate the Agreement for title defects, We will refund the Deposit to You once You execute Our Mutual Release Agreement.

(b) If easements are required after Settlement, You agree to cooperate with Us, for no additional consideration (monetary or otherwise) in executing and delivering any and all documents related to such easements.

(c) You are purchasing a completed home from Us and We are not acting as a contractor for You in the construction of the Home. You acquire no right, title or interest in the Property or the Home by virtue of this Agreement except the right and obligation to purchase the completed Home and Lot in accordance with the terms of this Agreement. Equitable title shall remain vested in Us until delivery of the deed at Settlement.

### 13. Default.

(a) Default-Purchaser. If You fail to make full and timely Settlement or if You otherwise breach any provision under this Agreement, the damages that We will or may suffer as a result of Your breach or default are uncertain and not reasonably calculable with certainty. Accordingly, We reserve the right to retain the Deposit as liquidated damages and not as a penalty, in which event You and We will be relieved from further liability hereunder. In the alternative, We may retain the Deposit for the payment of damages and pursue such legal and/or equitable remedies We may have on account of Your breach or default, including, but not limited to, specific performance. In the event You fail to take title to the Property on the Actual Settlement Date as required in this Agreement, We may, in Our sole discretion, agree to extend the time of Settlement. In the event You do not settle on the Actual Settlement Date, regardless of whether or not We agreed to extend the time of Settlement, You will be responsible for payment of a late settlement charge computed at the rate of 1% of the unpaid balance of the Purchase Price per month beginning on the originally scheduled Settlement Date through the rescheduled Actual Settlement Date. No interest rate charged herein shall be in excess of that permitted by law. If there are multiple purchasers, each of You shall be jointly and severally liable hereunder. In the event that You are in breach or default under this Agreement, You will be responsible for reasonable attorneys' fees We incur in enforcing this Agreement.

(b) **Default-Seller.** We will be deemed to be in default upon Our failure (1) to complete Settlement as required hereunder; or (2) to perform the obligations required to be performed by Us hereunder prior to Settlement, unless You are in default. Your sole and exclusive remedy if We default shall be to recover Your Deposit (as defined in Paragraph 2 and to the extent previously paid to Us) plus interest on Your Deposit at the legal rate since the date of Our breach or default, plus the sum of One Thousand Dollars ($1,000.00) as liquidated damages and not a penalty (which sum is a reasonable estimate of actual damages which cannot be forecasted with certainty), in return for which You and We shall be automatically released from this Agreement and You would have no further rights to the Property. If the limitation of Your remedies (as provided above) is determined by a court to be unenforceable, Your sole remedy in the event of a pre-Settlement default by Us under (1) or (2) above shall be limited to the right to recover the greater of (A) the Deposit (to the extent previously paid to Us) together with accrued interest thereon at the legal rate or (B) actual damages You have suffered as a result of Our pre-Settlement default (as hereafter defined), in return for which You and We shall be automatically deemed released from this Agreement and the Property. The term "actual damages" shall mean the difference between the fair market value of the Property on the date We default and the Purchase Price. TO THE MAXIMUM EXTENT ALLOWED BY APPLICABLE LAW, YOU EXPRESSLY WAIVE THE RIGHT TO SUE FOR SPECIFIC PERFORMANCE OF THIS AGREEMENT AS WELL AS ANY CLAIMED RIGHT TO ASSERT OR FILE A LIS PENDENS AGAINST THE PROPERTY AND FURTHER COVENANT NOT TO DO EITHER UNDER ANY CIRCUMSTANCES. You agree that the liquidated damages provision set forth above is sufficient consideration for Your waiver of the right to sue for specific performance. All of Your rights to sue Us for default or breach of this Agreement shall merge with the deed and Your sole and exclusive remedy for any post-Settlement default by Us under the portions of this Agreement that survive Settlement shall be limited to the lesser of (i) the cost to perform or (ii) the diminution in the Property value caused by any such default, and Our alleged default in performance shall be judged exclusively by the written performance standards defined in the Limited Warranty. You hereby waive and release all other remedies following Settlement.

14. **Claims and Disputes.** You and We agree that any and all claims arising out of or relating to this Agreement, Settlement hereunder, or improvements to the Property, regardless of legal theory, except any claims under the Limited Warranty ("Claims"), shall be subject to a one (1) year limitation of action period and bar date. Such claims based on matters occurring before the Settlement Date shall be deemed to have arisen and accrued, if at all, and the one year limitation of action period for all such claims shall begin to run on the Actual Settlement Date. All application of the so-called "discovery rule" is mutually waived by the parties. By executing this Agreement, You acknowledge Your understanding and agreement to these terms and that the said one (1) year period is completely reasonable in all respects. Notwithstanding the foregoing, these bar date terms shall not apply to claims for indemnity and/or contribution by Us against You and/or any other person. These rights may only be enforced by You and Us and nothing herein shall be construed to create any third party beneficiary rights in any other person or entity.

15. **Naturally Occurring Gases, Arsenic and Other Metals.** You agree that this Agreement is not conditioned upon testing results for naturally occurring gases, including radon, arsenic, or other elemental metals, or the presence or lack of such gases, arsenic or other elemental metals affecting the Property. Upon Settlement, You will be deemed to have accepted the Property as to the presence of these gases and/or arsenic and/or other elemental metals now or in the future and Seller shall be released from any and all claims related to or arising from the presence of any naturally occurring gases, arsenic or other elemental metals. Purchasers seeking further information should contact the U.S. Environmental Protection Agency or their state environmental protection office.

16. **Biological Impurities.** Modern building codes require that homes be constructed to slow the escape of warm air from the house during the cold months and cold air during the warmer months. These tight construction requirements could also prevent certain invisible contaminants and irritants from escaping the Home. These could include animal dander, dust, dust mites, fungi, mold, bacteria and pollen, which we will call "Biological Impurities". These can be brought into the Home through the natural circulation of air, carried into the Home by people, animals or things, including building materials and, once brought into the Home, have no way of escaping. Moisture in the Home, which can be caused by the level of air conditioning or heating and natural components used in the construction of Your Home, such as wood, can cause these Biological Impurities to grow. Homeowners can take measures to minimize Biological Impurities, which measures are more fully listed in the Limited Warranty provided to You at Settlement. We are not experts in identifying Biological Impurities or any possible effects which they can cause to You or Your family. Under the Limited Warranty, We are responsible for repairing or replacing any damage caused by a defect in materials or workmanship in the original construction (please read the Limited Warranty carefully as limitations and exclusions apply). We are not responsible for any Biological Impurities that are not caused by defects in the original construction of Your Home or which are caused or made worse through Your actions or inactions.

17. **Landscaping And Storm Water Management.** You will be responsible, at Your sole cost and expense, for fully landscaping the Lot in accordance with the Homeowners Association covenants and/or guidelines (if applicable) within three (3) months after Settlement or as soon as weather will permit. If any Homeowners Association restriction or covenant is more restrictive than this Paragraph 17, then the Homeowners Association restriction shall prevail. Prior to commencing construction of the Home, We will obtain for the Property coverage under the Ohio Environmental Protection Agency ("OEPA") NPDES Construction Storm Water General Permit ("Ohio CGP"). Once We have completed all soil disturbing activities on the Property and established through hydroseeding, or other method of Our choice, a uniform vegetative cover to meet the requirements of the OEPA CGP, We will submit to OEPA a notice of termination of coverage under the Ohio CGP ("NOT") for the Property. We make no representations or warranties about permits (including OEPA permits) which may be required for future improvements or changes to the Property.

18. **Oral Statements or Promises.** Unless oral statements or promises are written into this Agreement, they are not enforceable under law. By including the terms below, You and We are making them part of this Agreement and agree to abide by these terms. THIS SECTION SHOULD NOT BE LEFT BLANK IF YOU ARE RELYING ON ANY ORAL STATEMENTS OR PROMISES. The following oral statements or promises have been made in conjunction with this Agreement and performance of each of these statements or promises is incorporated into each party's obligation to fully perform the terms of this Agreement:
N/A

19. **Insulation.** The type, size and R value of insulation to be installed in your new Home shall be at least as shown on the chart below. R means resistance to heat flow; the higher the R value, the greater the insulation power.

| LOCATION | R-VALUE* | TYPE** |
|---|---|---|
| Basement Slab · W/O Only | R-10 | 2' V and H Rigid Foam |
| Foundation Walls S.F.D. unfinished | R-11 | 3½" Fiberglass Batt |

| Foundation Walls S.F.D. finished | R-13 | 3½" Fiberglass Batt |
| Exterior Walls | R-13 | 3½" Fiberglass Batt |
| Walls adjacent to unconditioned space | R-13 | 3½" Fiberglass Batt |
| Floors above unconditioned space | R-30 | 6¼" Fiberglass Batt |
| Garage common walls | R-13 | 3½" Fiberglass Batt |
| Floors at overhangs (14" frame) | R-30 | 10" Fiberglass Batt |
| Floors at overhangs (11-7/8" frame) | R-30 | 10" Fiberglass Batt |
| Floors over garages (14" frame) | R-30 | 10" Fiberglass Batt |
| Floors over garages (11-7/8" frame) | R-30 | 10" Fiberglass Batt |
| Attics (flat) | R-49 | 14.75" Blown Fiberglass |
| Attics (cathedral) | R-38 | 12" Fiberglass Batt |

\*    This is a minimum rating; the R-value may be higher if required by local jurisdictions.
\*\*    Thickness of fiberglass insulation provided is based on U.S. Greenfiber, LLC Cocoon2 Stabilized Cellulose Insulation. Thickness may vary from manufacturer to manufacturer; however the R value will remain the same.

**20. Community/School Information.** We include certain information in Our marketing, advertising, promotional and sales documents regarding the community for informational purposes only and such information is given to the best of Our knowledge as of the date the information is given. We make no warranties as to the accuracy or timeliness of this information and You acknowledge that this information is subject to change, that You are not relying upon such information in entering into this Agreement and none of such information is a part of this Agreement. School district and boundary information may be obtained by contacting the appropriate County or City School Board.

**21. Successors and Assigns.** This Agreement shall be binding on the parties and their heirs, legal representatives and permitted assigns. You cannot assign this Agreement without Our prior written consent, which may be withheld at Our sole discretion.

**22. Risk of Loss.** We assume the risk of loss or damage to the Property by fire or other casualty until Settlement. If such loss or damage occurs, We may terminate this Agreement and refund the Deposit to You without further liability to You. In such event, You would have no right to or interest in fire or other casualty or hazard insurance proceeds.

**23. Time is of the Essence.** TIME IS OF THE ESSENCE FOR THIS AGREEMENT. This means that the failure to do what is required within the timeframes specified in this Agreement or, if no timeframe is given, within a reasonable period, is a default under the Agreement.

**24. Picture Release.** You give Us full permission to use, publish, and copyright photographic prints and any other reproductions of the Property, or any part thereof, for advertising, publicity, and for any and all bona fide commercial purposes whatsoever.

**25. Miscellaneous.** All notices and communications under this Agreement shall be in writing, except as otherwise provided herein, and shall be deemed duly given on the date such notice is (i) mailed by U.S. postal service regular mail or certified mail, first class postage prepaid, (ii) delivered to an overnight courier for next day delivery, (iii) sent by facsimile or electronic mail with transmission verification, or (iv) delivered by personal delivery. All communication to Seller shall be sent to the address provided at the beginning of this Agreement, and if to You to the address provided on the first page of this Agreement. The parties shall be responsible for notifying each other of any change of address. This Agreement (including any notices thereof) shall not be recorded. The invalidity of any provision of this Agreement shall not affect the validity or enforceability of any other provision set forth herein. Where the context requires, words in the singular shall be substituted for the plural and vice versa, and words in the masculine shall be substituted by any gender. This Agreement, its formation and enforceability shall be governed by the laws of the State of Ohio without regard for conflicts of law principles. Any rules of interpretation wherein this Agreement is construed against its drafter are waived.

**26. Entire Agreement.** This Agreement, together with the Ohio Addendum to Purchase Agreement, the Affiliated Business Arrangement Disclosure, and all other addenda pertaining thereto are incorporated by reference and constitute the entire and final Agreement. No other prior or contemporaneous agreements, representations, promises or terms (written or oral) are part of this Agreement, but are superseded by this written Agreement. No additions or changes to this Agreement shall be valid or binding unless signed by You and Our authorized officer.

**27. Sales and Marketing Representative Acknowledgment; Broker Commission.** The Sales Representative works for Us, which means that he or she may assist You in purchasing the property, but his or her duty of loyalty is only to Us. Additionally, You warrant to Us that this sale was brought about solely by Our sales personnel and that no outside broker or salesperson was the procuring cause of this sale, unless the box below is checked.

☐ If the box to the left is checked, You have engaged the services of a realtor and broker. You agree to hold Us harmless and to defend Us against any claim for compensation of any kind made by any realtor or broker in connection with this Agreement except for the realtor and broker identified below. We agree to pay Broker a commission in the amount of either:

☐ _____ % of $_____; or

☐ _____ % of Purchase Price

The commission is payable upon disbursement of funds at Settlement. Any commission due to Broker shall not be deemed earned until Settlement and We will pay the commission to the Broker from the Settlement proceeds.

Broker Name and Address: _____

_____, _____, _____ _____
Realtor Name and Address: _____ _____

_____, _____, _____ _____

**28. Merger.** Except as specifically provided in this Agreement, all of Your rights and remedies under the Agreement shall merge with (and shall be completely extinguished and superseded by) the deed delivered to You at Settlement. The sole and only exceptions

to that intended and agreed merger are those rights and remedies (if any) which are expressly defined in (a) the deed, and (b) the Limited Warranty to be issued to You at Settlement. You hereby voluntarily and expressly waive and release all contrary claims and entitlements. You agree to execute any documentation reasonably required at Settlement to further memorialize the intent of the parties stated in this Paragraph 28 and that Your rights and remedies post-Settlement shall be limited to items (a) and (b) herein. Unless otherwise expressly stated in the Agreement, all of Your obligations under the Agreement and all of the Our rights and remedies under the Agreement, including but not limited to, Paragraphs 1, 6, 7, 9(c)-(e), 11, 12(b), 13(b), 14-20, 24-28 as well as all Addenda, shall survive and shall not be merged into the deed delivered at Settlement.

29.  THIS IS A LEGALLY BINDING CONTRACT. READ AND UNDERSTAND ALL PROVISIONS PRIOR TO SIGNING. IF YOU DO NOT UNDERSTAND, SEEK LEGAL OR OTHER COMPETENT ADVICE. IF YOU SIGN BELOW, IT SHALL BE CONCLUSIVELY PRESUMED THAT YOU HAVE FULLY READ AND UNDERSTOOD ALL OF THE TERMS OF THIS AGREEMENT. YOU ACKNOWLEDGE THAT THIS AGREEMENT, AS SIGNED BY YOU ALONE, CONSTITUTES AN OFFER TO PURCHASE AND THAT THIS AGREEMENT SHALL NOT BE BINDING UPON US UNTIL EXECUTED BY ONE OF OUR VICE PRESIDENTS. THE SALESPERSON OR REPRESENTATIVE RECOMMENDING APPROVAL IS NOT SUCH A VICE PRESIDENT. YOUR OFFER SHALL BE REVOCABLE ONLY BY WRITTEN NOTICE OF REVOCATION GIVEN TO AND RECEIVED BY OUR APPLICABLE VICE PRESIDENT PRIOR TO OUR ACCEPTANCE. WE ARE NOT REQUIRED TO PROVIDE NOTICE OF OUR ACCEPTANCE TO YOU AND ACCEPTANCE OCCURS UPON SIGNATURE BY OUR VICE PRESIDENT.

PURCHASER:

Date:_____    _____

Date:_____    _____

SELLER:

NVR, INC. t/a___**Ryan Homes**___

Date:_____    By:_____
                                      Vice President

Lot __M150__ Block ____

Community _____ Winfield Farm _____
Property Address 9072 NASH LANE NORTH RIDGEVILLE, OH 44039

# OHIO ADDENDUM TO PURCHASE AGREEMENT

Addendum made this __2__ day of _____ June _____, 20__21__ to a Purchase Agreement by and between NVR, Inc. t/a

__Ryan Homes_____ (Seller", "Us", "Our" or "We") and _____ Victoria Lawrence _____ and _____ (individually and

collectively "Purchaser", "You or "Your"), dated __06/02/21__ (the "Agreement").

Below are a series of addenda which, if checked in the left margin by Seller, are made a part of the Agreement as of the date below.

## [X] HOMEOWNERS ASSOCIATION ADDENDUM

You acknowledge that the Property is part of the _____ Winfield Farm _____ Homeowners Association and that You have received the following Homeowners Association documents:
- Declaration of covenants, conditions, restrictions and easements including amendments (if applicable)
- Bylaws of Association (if applicable)
- Public Offering Statement (if applicable)
- Operating Budget (if applicable)
- Other: _____

You further acknowledge that You shall be obligated to pay a one time initial capital account assessment contribution, collected at Settlement, in the amount of $**500.00** and an estimated annual assessment of $**600.00**, which is estimated to be payable in the amount of $**600.00** per **12 months**, made payable to _____ Winfield Farms HOA _____.

## [ ] COMMON DRIVEWAY ADDENDUM

The Property subject to the Agreement is located on a pipe-stem lot and requires a common driveway. This will require the establishment of an easement over this Lot and adjacent lots for the construction and maintenance of a common driveway to be shared by the owners of the affected lots. The easement will provide that the owners of the lots share equally in the care and maintenance of the driveway and that none of the owners may restrict the use of the driveway by the other owners. This easement may not be established prior to Settlement and You agree to execute any documents necessary for the establishment and recordation of such an easement at any time after Settlement.

## [ ] MODEL HOME PURCHASE ADDENDUM

The Property shall, upon Settlement, be leased to Us for use as a model home pursuant to the terms of the Lease Agreement attached hereto. In addition, You shall not have the right to select any options, nor shall change orders be allowed, except as We may permit on a limited basis. All references in the Purchase Agreement to the Change Order Policy are hereby deleted since no changes to the model home selections are permitted.

## [ ] WELL WATER ADDENDUM

The Property will be served by a private well water system. We will obtain all necessary approvals and permits for the construction of the water well. We will provide a water well which meets all applicable standards required by the city or county in which the Property is located. The water well shall be covered by Our Limited Warranty. Our Limited Warranty does not cover issues related to water yield or water quality subsequent to Settlement.

## [ ] PLAT RECORDATION ADDENDUM

The plat of subdivision which creates the Lot subject to this Agreement has not been recorded among the land records of the applicable County as of the date of this Agreement. This Agreement is expressly contingent upon the recordation of the plat of subdivision. If the plat of subdivision is not recorded within six (6) months after the date of this Agreement, We have the following options:

a) We may terminate this Agreement and return the Deposit to You upon Your execution of a Mutual Release Agreement; or

b) We may extend this contingency for an additional period, up to the 2-year limitation provided in Paragraph 9(a) of the Agreement. If the plat is still not recorded after the extension, any additional extensions beyond the 2-year period may only be given with Your consent. If You do not consent to further extensions, We will return Your Deposit upon Your execution of a Mutual Release Agreement.

Prior to recordation, We reserve the right to change the dimensions, boundary lines, shape or size of the Lot. In the event the Lot size is reduced from the initial plan signed by You by fifteen percent (15%) or more as a result of any changes to the Plat, We will notify You in writing within ten (10) days of the date the Plat is recorded and You, at Your option, may terminate this Agreement by providing written notice to Us within five (5) days after receipt of said notice. If You elect to terminate this Agreement, We will refund Your Deposit upon Your execution of a Mutual Release Agreement. This Addendum shall not survive Settlement.

## [ ] WETLANDS ADDENDUM

You acknowledge that the Lot contains "wetlands" which are required to be left in their natural state.  You agree that you will maintain the "wetlands" in their natural state and abide by all covenants and restrictions that may be specified in the subdivision plat, and any federal, state or local laws or ordinances pertaining to "wetlands."

## ☐ SEPTIC ADDENDUM

The Property will be served by a private septic system.  We will obtain all necessary approvals and permits for the construction of the septic system.  We will provide a septic system which meets all applicable standards required by the city or county in which the Property is located.  We will not be responsible for failure of the septic system occurring after Settlement, other than as specifically provided in Our Limited Warranty.  You acknowledge that the size of the percolation field serving the septic system is designed and approved only for the number of bedrooms originally constructed in the Home and that the number of bedrooms in the Home may not be increased without significant modifications to the septic system for which you would be responsible.

## ☐ CASH ADDENDUM

You have elected not to obtain a mortgage loan for the purchase of the Property and You will pay the Purchase Price, in accordance with Paragraph 4 of the Agreement, in cash or other immediately available funds.  You may be required, at any time, to provide proof of available funds acceptable to Us in Our sole discretion.  We have agreed to provide You with a discount against cash due at Settlement, including financing and other Closing Costs as permitted by applicable law ("Cash Discount") in the amount of $ . Payment of the Cash Discount is not conditioned upon the use of a mortgage lender.  The amount of the Cash Discount shown above shall not exceed the actual amount of Closing Costs required to be paid by Purchaser at Settlement.  It is the intent of this provision that there shall be no cash payment to Purchaser at Settlement. The Cash Discount shall be reduced by an amount equal to any Closing Costs that are required by State law or regulation to be paid by Seller.

If You change financing to include a mortgage loan, this Cash Addendum shall be null and void.

## ☐ CLOSING COSTS ADDENDUM

At Your request, We have agreed to increase the Purchase Price by $_____ (the "Additional Assistance") so that You can finance all/or part of Your Closing Costs.  The Additional Assistance will be utilized at Settlement solely for payment of Closing Costs as defined in the Agreement. The Purchase Price is thereby increased from $_____ to $_____ .

The payment and financing of Closing Costs pursuant to this Addendum is not contingent upon the use of NVR Mortgage Finance, Inc. or any other affiliate of the Seller.

The increase in the Purchase Price pursuant to this Addendum above is expressly conditioned upon the appraised value of the Property being at or above the Purchase Price (as defined in the Agreement), if applicable.  In the event the appraised value of the Property is less than the Purchase Price, this Addendum shall be null and void and Purchaser shall be required to pay the Closing Costs from Purchaser's funds.

You acknowledge that not all lenders allow the Purchase Price to be increased for financed Closing Costs, and consequently any requested mortgage financing may be declined.  The interest rate on the Purchaser's mortgage loan may be higher than it would otherwise be if Closing Costs were not being financed at Purchaser's request and Purchaser will have higher monthly payments, a larger mortgage and will pay more interest and finance charges over the life of the mortgage loan.  Additionally, this increase in the Purchase Price could result in higher real estate taxes or assessments on the Property.  Purchaser further acknowledges that the Closing Costs being added to the Purchase Price will increase the mortgage loan amount, may result in a higher annual percentage rate on the mortgage loan, may require a higher amount of hazard insurance, private mortgage insurance or any other type of insurance obtained in connection with the purchase and financing of the Property and may increase the Purchaser's Closing Costs.

## ☒ CERTIFICATE OF INSURANCE

Purchaser acknowledges receipt of a certificate of insurance for the Seller as required pursuant to the Home Construction Service Suppliers Act.

This Addendum, upon execution by both parties, is herewith made an integral part of the aforementioned Agreement.

Except as specifically provided above, all terms and conditions of the Agreement remain in full force and effect.

PURCHASER:

Date:_____    _____

Date:_____    _____

SELLER:

NVR, INC. t/a_____Ryan Homes_____

Date:_____     By:_____

Vice President

## AFFILIATED BUSINESS ARRANGEMENT DISCLOSURE

To: _____**Victoria  Lawrence**_____ / _____ ("Purchaser" or "You")
From: NVR, Inc., t/a _____**Ryan Homes**_____ ("Seller". "Us" or "We")
Lot **00000150** Block/Section _____/_____ Community: _____**Winfield Farm**_____

In connection with the purchase of the Property listed above. You may need a mortgage loan and closing services.  We recommend NVR Mortgage Finance, Inc. ("NVRM") for mortgage lending services. For closing services, we recommend NVR Title Agency, LLC in the Northeast Ohio region ("NVR Title") and First NVR Settlement Services, LLC in the Southwest Ohio region ("First NVR"). NVRM, NVR Title and First NVR provide efficient and professional services at competitive rates.  Please be advised that We have a business relationship with NVRM, NVR Title and First NVR.  Specifically, NVRM is a wholly-owned subsidiary of NVR, Inc. NVR Settlement Services, Inc., which is wholly owned by NVRM, is a member of each of NVR Title and First NVR.  Because of this relationship, this referral may provide Us with a financial or other benefit.

Set forth below is the estimated charge or range of charges for the services listed.  You are NOT required to use the listed provider(s) as a condition for the purchase of the Property.  THERE ARE FREQUENTLY OTHER SETTLEMENT SERVICE PROVIDERS AVAILABLE WITH SIMILAR SERVICES.  YOU ARE FREE TO SHOP AROUND TO DETERMINE THAT YOU ARE RECEIVING THE BEST SERVICES AND THE BEST RATE FOR THESE SERVICES.

NVR MORTGAGE CHARGES:

    1. Loan origination fee(s)          1% to 3%
    2. Credit report          $25.00 to $100.00
    3. Appraisal          $400.00 to $1.000.00

NVR TITLE CHARGES:

    1. Title exam fee          $55.00 to $500.00
    2. Settlement or closing fee          $500.00 to $1.500.00
    3. Lender's title insurance premium          $325.00 to $5,000.00
    4. Owner's title insurance premium          $350.00 to $6,000.00
    5. Title Insurance Binder Fee          $25.00 to $200.00

## ACKNOWLEDGEMENT

I/We have read this disclosure, and understand that Seller is referring me/us to purchase the above-described settlement services and Seller may receive a financial or other benefit as the result of this referral.

_____
Date

_____
Purchaser

_____
Date

_____
Purchaser



**TOM ORLANDO**

Lorain County Clerk of Courts
225 Court Street - First Floor
Elyria, OH 44035-5512

CERTIFIED MAIL

9414 7266 9904 2243 5055 07



US.POSTAGE ™ PITNEY BOWES

ZIP 44035 $ 011.26⁰
02 4W
0000383441 JUN. 25. 2025

NVR, INC. C/O CORPORATION SERVI(
1160 DUBLIN ROAD
SUITE 400

COLUMBUS        OH   43215